IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:23-CR-202 |
| | ) | |
| SAP SE, | ) | Hon. Rossie D. Alston, Jr. |
| | ) | |
| Defendant. | ) | |

**FILED IN OPEN COURT**

**JAN 1 0 2024**

**CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA**

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times relevant to this Information, unless otherwise stated:

### GENERAL ALLEGATIONS

### The Foreign Corrupt Practices Act

1.      The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15,

United States Code, Sections 78dd-l *et seq.*, was enacted by Congress for the purpose of, among

other things, making it unlawful to act corruptly in furtherance of an offer, promise,

authorization, or payment of money or anything of value, directly or indirectly, to a foreign

official for the purpose of assisting in obtaining or retaining business for, or directing business

to, any person.

### The Defendant SAP, its Subsidiary Entities, and Related Individuals

2.      SAP was a global software company headquartered in Walldorf, Germany. SAP

provided a broad array of software, licenses and maintenance support, cloud subscriptions, and

professional services.  SAP had a class of securities registered pursuant to Section 12 of the

Securities Exchange Act of 1934 (Title 15, United States Code, Section 78l) and was required to

file periodic reports with the U.S. Securities and Exchange Commission ("SEC"). Accordingly, during the relevant time period, SAP was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1 and 78m(b).

3.       SAP Africa was a wholly owned and controlled subsidiary of SAP, located in South Africa and operating in various countries throughout Africa, that sold and maintained SAP software, and provided other professional services, on behalf of SAP. SAP Africa was an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.       SAP South Africa ("SAP SA") was a wholly owned and controlled subsidiary of SAP, located and operating in South Africa, that sold and maintained SAP software, and provided other professional services, on behalf of SAP. SAP SA was an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

5.       SAP Indonesia was a wholly owned and controlled subsidiary of SAP, located and operating in Indonesia, that sold and maintained SAP software, and provided other professional services, on behalf of SAP. SAP Indonesia was an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

6.       "SAP Employee 1," a South African citizen whose identity is known to the United States and the Company, was an employee of SAP Africa and an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

7.       "SAP Employee 2," a South African citizen whose identity is known to the United States and the Company, was an employee of SAP Africa and an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.      "SAP Employee 3," a South African citizen whose identity is known to the United States and the Company, was an employee of SAP South Africa and an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.      "SAP Employee 4," a South African citizen whose identity is known to the United States and the Company, was an employee of SAP South Africa and an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

10.     "SAP Employee 5," an Indonesian citizen whose identity is known to the United States and the Company, was an employee of SAP Indonesia and an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11.     "SAP Employee 6," an Indonesian citizen whose identity is known to the United States and the Company, was an employee of SAP Indonesia and, at alternate times, an employee of Intermediary 6 (described below), and was an "agent" of an "issuer," SAP, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12.     "Indonesian Consultant 1," an Indonesian citizen whose identity is known to the United States and the Company, was a consultant who worked on behalf of SAP Indonesia in obtaining and retaining business for SAP Indonesia with the Kementerian Kelautan dan Perikanan.

**Overview of the Conspiracies**

13.     In or about and between 2013 and 2018, SAP, through certain of its agents, knowingly and willfully conspired and agreed with others to (i) offer and pay money and other things of value to foreign officials in South Africa and Indonesia to secure improper advantages in order to obtain and retain business with departments, agencies, and instrumentalities of foreign governments, contrary to Title 15, United States Code, Section 78dd-1(a); and (ii) maintain false

3

books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of the assets of SAP, contrary to Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

14.    In furtherance of the schemes described above, SAP and its co-conspirators made bribe payments and provided other things of value intended for the benefit of South African and Indonesian foreign officials, delivering money in the form of cash payments, political contributions, and wire and other electronic transfers, along with luxury goods acquired during shopping trips.  In carrying out the schemes described herein, SAP and its co-conspirators used the means and instrumentalities of interstate commerce.

15.    With respect to certain conduct in South Africa, and in furtherance of the schemes described above, SAP also made payments to third parties with no legitimate business purpose and created false business records regarding the nature and designation of such payments and the accuracy of SAP South Africa's financial reporting.  Those false records were subsequently reflected in SAP's consolidated financials and associated filings with the SEC.  From the schemes and conduct described herein, SAP obtained profits totaling $103,396,765.

## The South Africa Conspiracy

16.    In or about and between 2013 and 2017, through its agents, including SAP Africa, SAP South Africa, and SAP Employees 1–4, SAP engaged in a scheme to bribe South African officials and to falsify SAP's books, records, and accounts, all with the goal of obtaining improper advantages for SAP in connection with various contracts between and among SAP and South African departments, agencies, and instrumentalities.  In furtherance of this conspiracy, SAP relied, in part, on third party intermediaries to facilitate payments to South African officials and

4

SAP engaged other third parties with no legitimate business purpose, and thereafter falsified SAP's books and records regarding its payments to those third parties.

**A. Foreign Government Entities, Foreign Officials and Third Party Intermediaries**

17. City of Johannesburg ("CoJ") was a municipality in Johannesburg, South Africa, that administered certain city services to its constituents. Such services included electricity, waste and sanitation, and solid waste management, among others. CoJ was controlled by the government of South Africa and performed functions that South Africa treated as its own. CoJ was a "department," "agency," or "instrumentality" of a foreign government, and CoJ's managers, officers, and employees, were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

18. Department of Water and Sanitation ("DWS") was a South African state-owned and state-controlled custodian of water services that operated to protect and manage the delivery of effective and safe water supply within South Africa. DWS was controlled by the government of South Africa and performed functions that South Africa treated as its own. DWS was an "instrumentality" of a foreign government, and DWS's managers, officers, and employees, were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

19. City of Tshwane ("CoT") was a municipality in or around the area of Gauteng Province and Pretoria, South Africa. CoT delivered various municipal services to its residents, including agricultural assistance, law enforcement, and transportation services, among others. CoT was controlled by the government of South Africa and performed functions that South Africa treated as its own. CoT was a "department," "agency," or "instrumentality" of a foreign

government, and CoT's managers, officers, and employees, were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

20.     Eskom Holdings Limited ("Eskom") was a South African state-owned and state-controlled energy company headquartered in Sunninghill, South Africa, that operated to generate and transmit electricity in South Africa. The South African government was the sole owner of Eskom shares. Eskom was controlled by the government of South Africa and performed functions that South Africa treated as its own. Eskom was an "instrumentality" of a foreign government, and Eskom's managers, officers, and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

21.     "Intermediaries 1–5," entities the identities of which are known to the United States and the Company, were South African companies that worked with, and on behalf of, SAP South Africa in its efforts to provide software and services to South African departments, agencies, and instrumentalities.

22.     "CoJ Official 1," a South African citizen whose identity is known to the United States and the Company, was a high-ranking executive of the City of Johannesburg. CoJ Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

23.     "DWS Official 1," a South African citizen whose identity is known to the United States and the Company, was a high-ranking executive of the Department of Water and Sanitation. DWS Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

24.     "Gauteng Official 1," a South African citizen whose identity is known to the United States and the Company, was an executive on the Gauteng Gambling Board and a director of multiple South African business entities. Gauteng Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

**B. Bribery of South African Government Officials and Falsification of Books and Records**

25.     In or about and between 2013 and 2017, acting as agents of SAP and for its benefit, SAP Employees 1–4 engaged in bribery of South African officials in order to obtain and retain business with South African departments, agencies, and instrumentalities. In addition, in connection with the scheme to pay bribes to South African officials, they also conspired to falsify SAP's books, records, and accounts.

26.     To accomplish the objectives of the scheme, SAP, through its agents, engaged in communications among co-conspirators and with South African officials, relying on email, messaging apps, and other forms of communication that used the means and instrumentalities of interstate commerce.

27.     In or about August 2016, SAP provided software and professional services to CoJ pursuant to an ongoing contract (the "2015–2016 CoJ Contract"). The 2015–2016 CoJ Contract more than quintupled SAP's revenue from previous contracts SAP SA had entered into with CoJ. In obtaining and retaining the 2015–2016 CoJ Contract, SAP relied on Intermediary 1 as a conduit for bribe payments, which were delivered in approximately August 2016.

28.     On or about August 1, 2016, SAP Employee 2 and CoJ Official 1 exchanged text messages to discuss a payment for CoJ Official 1. In the exchange, SAP Employee 2 represented that SAP Employee 2 and SAP Employee 3 could "confirm" the forthcoming bribe payment in

connection with the Company's 2015–2016 CoJ Contract.  In response, less than one hour later, CoJ Official 1 asked whether CoJ Official 1 "[s]hould give [SAP Employee 2] the bank account or you'll give me cash."

29.     On or about August 1, 2016, in response to the message referenced in paragraph 28 above, SAP Employee 2 responded, requesting account information, and CoJ Official 1 transmitted account details for a political party's bank account.  SAP Employee 2 then forwarded the details to SAP Employee 3, with the understanding that funds would be subsequently transferred to the account.

30.     On or about August 26, 2016, SAP SA, acting on the authorization of SAP Employee 2 and others, transmitted approximately 2,200,000 South African rand (approximately $155,555 in 2016) to Intermediary 1.  The payment was falsely recorded in SAP SA's books and records as a "Sales Commission."

31.     On or about August 29, 2016, Intermediary 1 transferred approximately 2,200,000 South African rand to an entity understood by the Managing Director of Intermediary 1 and SAP Employee 2 to be associated with a CoJ official.

32.     Also on or about August 29, 2016, following the transmission of the 2,200,000 South African rand bribe through Intermediary 1 referenced in paragraph 31 above, the Managing Director of Intermediary 1 emailed SAP Employee 2, attaching a copy of a signed sales commission agreement.  The email further confirmed to SAP Employee 2 that "[y]our payment has gone."

33.     Upon receiving the email confirmation, on or about August 29, 2016, SAP Employee 2 forwarded the email and the signed agreement for processing within SAP SA, but deleted the "[y]our payment has gone" language.

34.     In or around November 2016, SAP, acting through its agents, including SAP Employee 1 and Employee 4, paid a bribe to DWS Official 1 to obtain or retain its contract to provide software and services to DWS (the "DWS Contract"). SAP routed its bribe payment through Intermediary 2, which then passed the payment through another entity in an attempt to conceal the nature of the payment.

35.     On or about November 29, 2016, and in connection with the DWS Contract, SAP Employee 4 approved payment of a bribe of approximately 3,000,000 South African rand (approximately $215,800 in 2016) to DWS Official 1, which was routed through Intermediary 2. Upon receiving the funds from SAP, in an attempt to avoid detection, on or about November 29, 2016, Intermediary 2 paid the bribe to another corporate entity, for eventual forwarding to or for the benefit of DWS Official 1.

36.     In obtaining the DWS Contract, SAP undertook the unusual step of engaging two third party intermediaries. Each intermediary was paid a commission of 14.9 percent of SAP's revenue from the DWS Contract—the maximum percentage allowable per third party payment without requiring significantly higher-level approvals within the Company. Nevertheless, SAP Employee 4 approved the engagement of Intermediary 2, along with another third party intermediary entity.

37.     SAP conducted only limited due diligence of Intermediary 2 during its onboarding in 2015. Subsequent review by SAP in 2017 revealed that Intermediary 2 had no financial

statements (audited or unaudited), had not filed any returns for employee tax purposes, and found no signs of activity at Intermediary 2's claimed business address.

38.     After the bribe was paid, SAP Employee 4 and the Director of Intermediary 2 discussed the bribe, as well as ongoing investigative efforts that might uncover the scheme.  The two individuals discussed the importance of destroying any documents associated with the transaction, and the need to fabricate an explanation for the payment.  During the conversation, SAP Employee 4 and the Director of Intermediary 2 further referenced the participation of SAP Employee 1 and another SAP employee in the scheme to obtain business with DWS.

39.     SAP, through SAP SA and others, also engaged multiple third parties to obtain business with various departments, agencies, and instrumentalities of South Africa.  Those third parties, including Intermediary 3, Intermediary 4, and Intermediary 5, received payments that SAP SA falsely booked as "commissions" and other similar payments when, in fact, SAP Employee 1 and SAP Employee 2, among others, knew that the payments were made in exchange for no legitimate services.  For example:

        a.     At the approval and direction of SAP Employees 1 and 2, SAP SA partnered with Intermediary 3 to obtain and retain business with CoT and multiple other South African government agencies and state-owned entities.  SAP SA paid Intermediary 3 more than 9,000,000 South African Rand (more than $900,000 in 2013 and 2014) in connection with these engagements, falsely booking these payments as "commissions," despite the lack of substantive work performed by Intermediary 3.

        b.     On multiple occasions, including at least on or about November 14, 2013 and September 23, 2014, SAP SA paid a "commission" to Intermediary 3 and, within days of

10

receipt and without providing substantive work in return, Intermediary 3 forwarded nearly all of the purported commissions to business entities owned or controlled by Gauteng Official 1.

        c.     SAP engaged multiple other third party intermediaries, including Intermediaries 4 and 5, to assist in obtaining and retaining business with Eskom and other South African, departments, agencies, and instrumentalities, and falsely booked payments to such entities as being for sales-related services when, in fact, the intermediaries provided no legitimate services. Among other things, the third party intermediaries failed to provide any deliverables, lacked experience or expertise in SAP's business, or were otherwise uninvolved in substantive work on behalf of SAP. Nevertheless, SAP paid such third party intermediaries—which were owned by individuals who were closely affiliated with multiple South African government officials—falsely recording the payments as "commissions" and similar expenses when, in fact, they were for no legitimate purpose.

    40.    On or about January 27, 2016 and January 19, 2017, executives of SAP Africa and SAP South Africa falsely certified to the operating effectiveness of internal controls over financial reporting, which included payments falsely booked as "commissions" and other, similar expenses, as described above.

    41.    On or about March 29, 2016 and February 28, 2017, SAP filed Form 20-F with the SEC for the fiscal years ended December 31, 2015 and December 31, 2016, respectively. The Form 20-F filings were submitted through the SEC's EDGAR system, which located its severs in the Eastern District of Virginia. Those Form 20-F filings included SAP's consolidated financial statements, which in turn incorporated the books and records of SAP and its subsidiaries, including SAP South Africa, and the false certifications referenced above.

**The Indonesia Conspiracy**

42.      Between approximately 2015 and 2018, SAP, through its agents, including but not limited to SAP Indonesia and its personnel, engaged in a scheme to bribe Indonesian officials, to obtain improper business advantages for SAP in connection with various contracts between and among SAP and Indonesian departments, agencies, and instrumentalities.  In furtherance of the conspiracy, SAP and its agents, either directly or through third party intermediaries, provided or offered payments and other things of value to and for the benefit of foreign officials.

**A.  Foreign Government Entities, Foreign Officials and Third Party Intermediaries**

43.      Balai Penyedia dan Pengelola Pembiayaan Telekomunikasi dan Informatika ("BP3TI") was an Indonesian state-owned and state-controlled Telecommunications and Information Accessibility Agency, operating under the auspices of the Indonesian Ministry of Communication and Information.  BP3TI was controlled by the government of Indonesia and performed functions that Indonesia treated as its own.  BP3TI was a "department," "agency," or "instrumentality" of a foreign government, and BP3TI's managers, officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

44.      The Kementerian Kelautan dan Perikanan ("KKP") was the Indonesian Ministry of Maritime Affairs and Fisheries, led by the Indonesian Minister of Maritime Affairs and Fisheries, and developed and implemented policies in the marine and fisheries sector, among other activities. KKP was controlled by the government of Indonesia and performed functions that Indonesia treated as its own.  KKP was a "department," "agency," or "instrumentality" of a foreign

government, and KKP's managers, officers, and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

45.     "Intermediary 6," an entity the identity of which is known to the United States and the Company, was an Indonesian company that worked with, and on behalf of, SAP Indonesia in its efforts to provide software and services to multiple Indonesian departments, agencies, and instrumentalities.

46.     "BP3TI Official 1," an Indonesian citizen whose identity is known to the United States and the Company, was a high-ranking executive of BP3TI.  BP3TI Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

47.     "KKP Official 1," an Indonesian citizen whose identity is known to the United States and the Company, was a high-ranking executive of KKP.  KKP Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

**B.  Bribery of Indonesian Government Officials**

48.     On or about June 8, 2018, SAP Employee 5 and Indonesian Consultant 1 exchanged text messages to coordinate bribes for multiple KKP officials.  SAP Employee 5 and Indonesian Consultant 1 discussed the amounts of the bribes, ranging from 50 million to 70 million Indonesian Rupiah (approximately $3,600 and $5,040, respectively, in 2018), as well as the method of delivery, with Indonesian Consultant 1 reporting that KKP Official 1 had requested cash.  SAP Employee 5 was advised to "[b]ring [an] empty envelope" and coordinated meeting with Indonesian Consultant 1 in the lobby of the KKP.

49.     In or about March 2018, SAP Indonesia, acting for the benefit of SAP, obtained multiple contracts to provide software and services to BP3TI (collectively, the "2018 BP3TI

Contracts"). In obtaining and retaining the 2018 BP3TI Contracts, SAP, acting through its agents, provided things of value to multiple Indonesian government officials and their family members.

50.     Also in or around June 2018, multiple officials of BP3TI, including BP3TI Official 1 and at least one family member of BP3TI Official 1, traveled to the United States. During the trip, they were accompanied by SAP Employee 6 who was, at the time, employed by Intermediary 6. SAP Employee 6 paid for shopping sprees for BP3TI Official 1 and a family member, purchasing handbags, keychains, novelties, gifts and other items.

51.     On or about June 8, 2018, SAP Employee 6, using the means and instrumentalities of interstate commerce, sent text messages from the United States to other co-conspirators in Indonesia, updating them on the purchases and sending pictures of the shopping trip. SAP Employee 6 had a budget of approximately $10,000 over five days and, during that time, also bought BP3TI Official 1 a luxury watch.

## COUNT ONE
## CONSPIRACY TO VIOLATE THE FCPA
## AND TO FALSIFY BOOKS AND RECORDS
## (18 U.S.C. § 371)

52.     The allegations contained in paragraphs one through 51 are realleged and incorporated as though fully set forth herein.

53.     In or about and between 2013 and 2017, both dates being approximate and inclusive, the defendant SAP, together with others, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States, to wit:

        a.      being an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the

14

giving of anything of value to a foreign official, and to a foreign political party and official thereof, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, and foreign political party and official thereof, in his, her, or its official capacity; (ii) inducing such foreign official, and foreign political party and official thereof, to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, and foreign political party and official thereof, to use his, her, or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist SAP and others in obtaining and retaining business for and with, and directing business to, SAP and others, in violation of Title 15, United States Code, Section 78dd-1(a); and

b.      to knowingly and willfully falsify and cause to be falsified books, records, and accounts required, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of the assets of SAP, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

(In violation of Title 18, United States Code, Section 371.)

### Overt Acts

54.      In furtherance of the conspiracy and to effect its objects, the defendant SAP, together with others, in the Eastern District of Virginia and elsewhere, committed and caused to be committed at least one of the following:

15

a.     On or about August 1, 2016, SAP Employee 2, acting on behalf and for the benefit of the Company, sent and received text messages with CoJ Official 1 to "confirm" a forthcoming bribe payment in connection with SAP's 2015–2016 CoJ Contract.

b.     On or about August 26, 2016, SAP SA transmitted approximately 2,200,000 South African Rand to Intermediary 1, falsely recording the payment as a "Sales Commission" when it was, in fact, intended for delivery to an entity understood by SAP Employee 2 to be associated with a CoJ official.

c.     On or about November 29, 2016, SAP Employee 4, acting on behalf and for the benefit of the Company, caused SAP SA to pay approximately 3,000,000 South African Rand to Intermediary 2, for ultimate delivery to and for the benefit of DWS Official 1.

d.     On or about September 23, 2014, SAP SA, acting on behalf and for the benefit of the Company, paid approximately 1,735,256 South African Rand to Intermediary 3, falsely booking the payment as a "commission" despite the lack of substantive work performed by Intermediary 3 and the absence of any legitimate business purpose for the payment.

e.     On or about January 27, 2016, executives of SAP Africa and SAP South Africa falsely certified to the operating effectiveness of internal controls over financial reporting, which included payments falsely booked as "commissions" and other, similar expenses.

f.     On or about March 29, 2016, SAP filed Form 20-F with the SEC for the fiscal year ended December 31, 2015.  That filing included SAP's consolidated financial statements, which incorporated the books and records of SAP and its subsidiaries, including SAP Africa and SAP South Africa, and the January 27, 2016 false certification referenced above.

16

## COUNT TWO
## CONSPIRACY TO VIOLATE THE FCPA
## (18 U.S.C. § 371)

55.     The allegations contained in paragraphs one through 54 are realleged and incorporated as though fully set forth herein.

56.     In or about and between 2015 and 2018, both dates being approximate and inclusive, the defendant SAP, together with others, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States, to wit:  being an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a foreign political party and official thereof, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, and foreign political party and official thereof, in his, her, or its official capacity; (ii) inducing such foreign official, and foreign political party and official thereof, to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, and foreign political party and official thereof, to use his, her, or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist SAP and others in obtaining and retaining business for and with, and directing business to, SAP and others, in violation of Title 15, United States Code, Section 78dd-1(a).

17

(In violation of Title 18, United States Code, Section 371.)

## Overt Acts

57.      In furtherance of the conspiracy and to effect its objects, the defendant SAP,

together with others, in the United States and elsewhere, committed and caused to be committed

at least one of the following:

a.      On or about June 8, 2018, SAP Employee 5 sent and received text

messages with Indonesian Consultant 1, discussing the amounts of bribes for KKP Official 1.

b.      In or around June 2018, SAP Employee 6, while in the United States,

purchased multiple items for BP3TI Official 1 and at least one family member of BP3TI Official

1, including handbags, keychains, novelties, gifts, a luxury watch, and other items.

c.      On or about June 8, 2018, SAP Employee 6 sent text messages from the

United States to other co-conspirators in Indonesia, updating them on the purchases and sending

pictures of the shopping trip.


JESSICA D. ABER
United States Attorney
Eastern District of Virginia

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice


Heidi B. Gesch, Assistant U.S. Attorney

William E. Schurmann, Trial Attorney
Jonathan P. Robell, Assistant Deputy Chief